PER CURIAM:
Writ denied. In 1995, an East Baton Rouge Parish jury found relator, Henri Broadway, guilty of the first degree murder of Corporal Betty Smothers. After finding Broadway guilty as charged, jurors unanimously agreed to impose a sentence of death, in light of the aggravating circumstances that Broadway had been engaged in the perpetration of an attempted armed robbery, that the victim was a peace officer engaged in her lawful duties, and Broadway knowingly created a risk of death or great bodily harm to more than one person. In accord with the jury's determination, the court sentenced Broadway to death. This court affirmed. State v. Broadway , 96-2659 (La. 10/19/99), 753 So.2d 801.
The evidence presented at trial showed that, on the evening of January 7, 1993, Corporal Betty Smothers was ambushed by two shooters while working off-duty escorting a store manager, Kimien Lee, to make a bank deposit in her police vehicle. Corporal Smothers was shot five times, and she died almost immediately from her wounds. Lee was shot 11 times, but survived. After the shooting stopped, one of the attackers peered into the driver's side window, and Lee made eye contact with him. The next day, Lee underwent hypnosis in the hospital to aid police in preparing a composite sketch of her attacker. The following day, after hypnosis, Lee described her attacker, including his "caramel complexion" and his camouflage jacket with "sleeves extended past his wrists." One year later, Lee picked Broadway out of a photographic lineup.
On January 9, 1993, a confidential informant identified Kevan Brumfield as one of the attackers and Eddie Paul as a person of interest. When questioned, Eddie Paul informed the police that his cousin West Paul, along with Kevan Brumfield and someone he knew only as A.J. or Ray J., were the perpetrators of the instant offense.
The police obtained warrants for Brumfield and West Paul, who were both arrested on January 11, 1993. The police identified Deron Brooks as a possible suspect. Eddie Paul viewed a photograph of Brooks and positively identified him as the man he knew as Ray J. and who had accompanied Brumfield and West Paul. The police obtained a warrant for Brooks and arrested him, but quickly released him upon learning that he had been in police custody at the time of the shooting.
*882 When questioned, West Paul implicated Broadway in the crime. When the police arrested Broadway at his home, he spontaneously stated, "I knew you were coming," and "I didn't shoot the police officer." On the way to the police station, Broadway also spontaneously stated that he had nothing to do with the killing of the police officer and nothing to do with Brumfield, although the police did not mention either the murder or Brumfield.
According to the police, Broadway initially denied any involvement in the crime, but admitted after being shown pictures of Corporal Smothers that he had been involved. He stated that Brumfield and "Smokey" picked him up to rob two women who were going to make a bank deposit, but claimed he did not know one of the women was a police officer. He further stated that they waited in the bushes until the women arrived, and he then ran toward the car and fired six or seven rounds with his pistol. Broadway refused to give a taped statement and claimed that he had not said anything, adding that he would deny anything the officers had written in their notes. Yet, according to the police, the detective read the notes to Broadway who initialed the statement. The police also searched Broadway's home after obtaining consent to search from his mother, and they seized a camouflage jacket similar to the one worn by the assailant as Lee described.
At trial, Lee positively identified Broadway as one of the perpetrators, and Broadway modeled the camouflage jacket for the jury to demonstrate that the sleeves did, in fact, extend over his wrists. Additionally, West Paul admitted to his participation as the driver of the getaway car and confirmed Broadway's participation in the robbery and murder. The defense called several family members and friends who testified that Broadway was at home in their company at the time of the murder.
Broadway testified on his own behalf and denied any involvement in the crime. He testified that Lee was mistaken in her identification or trying to turn suspicion away from herself, and that Paul was lying. He also specifically denied that he made any inculpatory statements to police and claimed that police beat him during his interrogation and gave jurors a detailed account of that attack which included blows struck by the fists of the officers and partial asphyxiation by a plastic bag pulled over his head.
After his conviction and sentence became final, post-conviction proceedings were initiated in 2002, and Broadway initially attempted to recuse the assistant district attorney, specifically, as well as the district attorney's office generally; to recuse the district court judge, and to obtain funds. In each instance, this court denied Broadway's applications seeking review of the rulings of the district court.[1]
In subsequent post-conviction pleadings, Broadway asserted claims of subornation of perjury; suppression of material exculpatory evidence; ineffective assistance of counsel; and juror misconduct. In response to the district court's denial of these claims, this court ordered that the district court conduct evidentiary hearings on the issues of the alleged suppression of material exculpatory evidence; ineffective assistance of counsel at the guilt stage; ineffective assistance of counsel at the penalty phase; and juror misconduct (with respect to the alleged operation of a gambling *883 pool). State v. Broadway , 08-1747 (La. 5/15/09), 8 So.3d 570.[2]
In accordance with this court's order, the district court conducted six days of evidentiary hearings, between July 2010 and February 2014, which included the taking of testimony from several experts and lay witnesses and the introduction of exhibits. On November 17, 2016, the district court rejected all of Broadway's claims, finding them meritless. We have reviewed Broadway's claims and find no reason to disturb the district court's ruling.
First, Broadway fails to show counsel rendered ineffective assistance[3] during the guilt phase of trial. As to counsel's disclosure of defense expert reports, even assuming counsel's decision to disclose these sensitive materials was unreasonable, Broadway fails to show resulting prejudice in a case in which he confessed to his participation in the offense and testified on his own behalf at trial, and thus was subject to rigorous cross-examination of his alibi defense and connections to his co-perpetrators. Cf. Jones v. Stotts , 59 F.3d 143, 146 (10th Cir. 1995) ("Defendant may prevail on ineffective assistance of counsel claim relating to trial strategy ... if he can show counsel's strategy decisions would not be considered sound.").
Broadway also fails to show counsel erred in cross-examining surviving victim Kimien Lee, as counsel's decisions as to which questions to ask on cross-examination generally form a part of trial strategy, see , e.g. , State v. Hoffman , 98-3118, p. 38 (La. 4/11/00), 768 So.2d 542, 577 ; State v. Brooks , 94-2438, pp. 6-7 (La. 10/16/95), 661 So.2d 1333, 1337, and, moreover, Broadway merely presents conclusory allegations. He thus fails to meet his burden of proof that counsel erred or show prejudice. La.C.Cr.P. art. 930.2.
As to relator's claims concerning counsel's failure to object, again, these decisions generally form a part of trial strategy see , e.g. , State v. Hoffman , supra ; State v. Brooks , supra , and, moreover, Broadway fails to show how counsel's actions rendered the trial unfair or affected the verdict. Notably, Broadway's claims concerning Paul's testimony on behalf of the state and the introduction of hearsay evidence through the testimony of Detective Bates were considered and rejected on appeal. See State v. Lee , 14-2374, pp. 8-9 (La. 9/18/15), 181 So.3d 631, 638 (an attempt "to re-litigate a claim that has been previously disposed of, by couching it as a post-conviction ineffective assistance of counsel claim, [should be] generally unavailing."); State v. Williams , 613 So.2d 252, 256-57 (La. App. 1 Cir. 1992) ("When the substantive issue that an attorney has not raised has no merit, then the claim that the attorney was ineffective for failing to raise the issue also has no merit."). Additionally, as to the introduction of inadmissible hearsay statements made by Broadway's mother through the testimony of Detective Odom, even assuming counsel unreasonably failed to challenge their admission, the error is harmless as the statements *884 were ultimately admissible at trial as extrinsic evidence, i.e. , prior inconsistent statements used to impeach the credibility of the witness. See La.C.E. art. 607(D)(2).
Lastly, Broadway argues that counsel erred by questioning him on direct examination about his criminal record, specifically his juvenile adjudications. Though a criminal defendant's juvenile record is generally not admissible under La.C.E. art. 609.1(F), Broadway fails to show resulting prejudice in a case in which the state presented overwhelming evidence of his guilt. We find the district court correctly rejected these claims as Broadway fails to show that counsel's deficient actions undermined confidence in the outcome of the proceedings.
In addition, Broadway fails to show that relief is warranted as a result of counsel's claimed failures at the penalty phase.[4] Broadway asserts counsel failed to discover evidence of domestic violence, mental health issues, and extreme poverty he endured as a child and teenager. He points to omitted evidence indicating the effects of frequent evictions and lack of a permanent residence; his childhood exposure to his father's physical abuse of his mother; and the impact his father's murder had on him at the age of 12, i.e. , depression; suicidal attempts; alcohol abuse; substance abuse; and delinquent behavior. In Broadway's view, had this evidence been presented, at least one juror would have voted for a life sentence.
However, even assuming arguendo counsel unreasonably failed to discover and present the omitted mitigating evidence, it is not probable that a jury would find the omitted evidence of Broadway's difficult childhood outweighed the aggravating factors that Broadway and his co-defendant, Kevan Brumfield, committed a cold-bloodied murder of a police officer and attempted to kill and seriously injured a second victim, Kimien Lee, during the course of a planned armed robbery. It is unreasonable to conclude that the penalty phase outcome would have been different even with the omitted evidence of Broadway's difficult childhood, and Broadway shows no district court error.
Next, Broadway claims the state suppressed exculpatory or impeachment evidence in violation of its duty under Brady v. Maryland , 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).[5] Broadway *885 argues the state suppressed evidence of two other suspects, Gregory Durden and Anthony Ray Wright, and the videotape of Kimien Lee's hypnosis session.
Specifically, Broadway claims the state suppressed investigative materials referencing Durden and Wright as initial suspects. Broadway emphasizes the state's failure to turn over documents referencing Durden's failure of a polygraph test; his statements about his knowledge of the Piggly Wiggly's nightly deposit schedules and procedures; and the report of a fellow Piggly Wiggly employee of his suspicious behavior on the night of the crime. As to Wright, Broadway points to a police report detailing a traffic stop of Wright on January 11, 1993, when he was driving a 1976 blue Oldsmobile. The police took photos of his face; the tire pattern; and the exterior of his vehicle; they seized a Lorcin .380 caliber automatic pistol; and took a statement from a witness who observed a vehicle similar to Wright's speeding away from the Circle K parking lot around the time of the crime. Broadway points out that Wright had a similar appearance to Lee's description of the perpetrator, and Wright had an extensive criminal history.
As a general matter, however, there exists no general duty to disclose false leads. Moore v. Illinois , 408 U.S. 786, 795, 92 S.Ct. 2562, 2568, 33 L.Ed.2d 706 (1972) ; State v. Nix , 327 So.2d 301, 320 (La. 1975). Moreover, even assuming these undisclosed investigative materials had any exculpatory value, relator fails to show that this withheld evidence rises to a level capable of lessening confidence in the verdict in a case in which Broadway confessed to his participation in the offense, corroborating Lee's identification of him. Kyles , 514 U.S. at 434, 115 S.Ct. at 1566. No error is shown.
Next, as to the suppression of the videotaped hypnosis session with Lee, Broadway asserts that the hypnosis video contained material impeachment evidence relating to Lee's identification of her attacker, including inconsistent statements *886 as to her attacker's eyes and her inability to view the attacker's face. Broadway argues that Lee's identification testimony was crucial to the case against him, thus the suppression of this impeachment evidence undermines the verdict.
Though Lee, the surviving victim, was a critical state witness and the video potentially carried impeachment value, on direct review, this court found no resulting prejudice from the court's denial of Broadway's motion to produce the video because the "descriptions [Lee] provided during and after hypnosis were essentially similar." Broadway , 96-2659, pp. 12-13, 753 So.2d at 811-12. The inconsistencies Broadway now points to deal only with minor variations in Lee's descriptions, and he fails to show the exculpatory value of the tape and therefore cannot show a violation of Brady .
Finally, Broadway shows no basis for this court's intervention as to his juror misconduct allegations of a gambling pool. The United States Supreme Court has held that the Sixth Amendment forbids a jury from being exposed to external influences during its deliberations. See Parker v. Gladden , 385 U.S. 363, 364, 87 S.Ct. 468, 470, 17 L.Ed.2d 420 (1966) ("the evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel" (internal quotation marks omitted) ); Turner v. Louisiana , 379 U.S. 466, 472, 85 S.Ct. 546, 549, 13 L.Ed.2d 424 (1965) ("The requirement that a jury's verdict 'must be based upon the evidence developed at the trial' goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury."); Remmer v. United States , 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954) ("private communication, contact, or tampering" with the jury is presumptively prejudicial); Mattox v. United States , 146 U.S. 140, 149, 13 S.Ct. 50, 53, 36 L.Ed. 917 (1892) ("in capital cases [...] the jury should pass upon the case free from external causes tending to disturb the exercise of deliberated and unbiased judgment"). Jurisprudence from this court is to the same effect. See , e.g. , State v. Duplissey , 550 So.2d 590 (La. 1989) ; State v. Sinegal , 393 So.2d 684 (La. 1981) ; State v. Marchand , 362 So.2d 1090 (La. 1978).
Based upon a review of the juror testimony given at the evidentiary hearing, the alternate juror and the jury foreperson testified to the existence of a single betting pool, and regardless of whether this pool concerned the end date of trial, or specifically the date when the case would be handed over to the jury, i.e. , before deliberations, Broadway fails to show that this pool related in any way to the merits of the case or the outcome of either phase of trial. Mrs. Clavier, the alternate juror called below as a defense witness, did not participate in the deliberations of either phase at trial, and the foreperson, Mr. Brumley, called below as a state witness, testified that the gambling pool had nothing to do with the deliberations. Thus, Broadway fails to show that this bet influenced the jury in returning the verdicts. La.C.Cr.P. art. 930.2. Accordingly, the claim fails.
Broadway has now fully litigated his application for state post-conviction relief. Similar to federal habeas relief, see 28 U.S.C. § 2244, Louisiana post-conviction procedure envisions the filing of a successive application only under the narrow circumstances provided in La.C.Cr.P. art. 930.4. Notably, the Legislature in 2013 La. Acts 251 amended that article to make the procedural bars against successive filings mandatory. Broadway's claims have now been fully litigated in accord with La.C.Cr.P. art. 930.6, and this denial is final.
*887 Hereafter, unless Broadway can show that one of the narrow exceptions authorizing the filing of a successive application applies, he has exhausted his right to state collateral review. The district court is ordered to record a minute entry consistent with this per curiam.
CRICHTON, J., concurs in part and dissents in part and assigns reasons.

State v. Broadway , 07-1325 (La. 10/5/07), 964 So.2d 940 ; State v. Broadway , 05-2400 (La. 4/28/06), 927 So.2d 296 ; State v. Broadway , 04-1851 (La. 12/17/04), 888 So.2d 864 ; State v. Broadway , 03-1520 (La. 3/12/04), 869 So.2d 815 ; State v. Broadway , 01-3366 (La. 4/10/02), 812 So.2d 658.

This court left intact the district court's denial of claims concerning subornation of perjury.

Under the standard for ineffective assistance of counsel set out in Strickland v. Washington , 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), adopted by this court in State v. Washington , 491 So.2d 1337, 1339 (La. 1986), a reviewing court must reverse a conviction if the defendant establishes (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's inadequate performance prejudiced defendant to the extent that the trial was rendered unfair and the verdict suspect.

A defendant at the penalty phase of a capital trial is entitled to the assistance of a reasonably competent attorney acting as a diligent, conscientious advocate for his life, State v. Fuller , 454 So.2d 119, 124 (La. 1984) ; State v. Berry , 430 So.2d 1005, 1007 (La. 1983) ; State v. Myles , 389 So.2d 12, 28 (La. 1980) (on reh'g); see also Burger v. Kemp , 483 U.S. 776, 788-89, 107 S.Ct. 3114, 3122-26, 97 L.Ed.2d 638 (1987), and counsel's dereliction may warrant relief even if the defendant has been convicted of a particularly egregious crime. See , e.g. , Williams v. Taylor , 529 U.S. 362, 368, 120 S.Ct. 1495, 1500, 146 L.Ed.2d 389 (2000) (committed two assaults on elderly women, leaving one in a persistent vegetative state) and Rompilla v. Beard , 545 U.S. 374, 377, 125 S.Ct. 2456, 2460, 162 L.Ed.2d 360 (2005) (stabbed victim repeatedly before setting fire to his body). To show ineffectiveness as a result of counsel's failure to present mitigating evidence, a petitioner must establish that: (1) counsel failed to undertake "a reasonable investigation [which] would have uncovered mitigating evidence;" and (2) failing to put on the available mitigating evidence "was not a tactical decision but reflects a failure by counsel to advocate for his client's cause;" (3) which caused "actual prejudice." State v. Hamilton , 92-2639, p. 6 (La. 7/1/97), 699 So.2d 29, 32 (citing State v. Brooks , supra ; State v. Sanders , 93-0001 (La. 11/30/94), 648 So.2d 1272 ).

In Brady v. Maryland , 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held that the suppression by the prosecution of evidence favorable to the accused after receiving a request for it violates a defendant's due process rights where the evidence is material either to guilt or punishment, without regard to the good or bad faith of the prosecution. Id. , 373 U.S. at 87, 83 S.Ct. at 1196-97. The Brady rule encompasses evidence which impeaches the testimony of a witness when the reliability or credibility of that witness may determine guilt or innocence. United States v. Bagley , 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985) ; Giglio v. United States , 405 U.S. 150, 154, 92 S.Ct. 763, 756, 31 L.Ed.2d 104 (1972) ; State v. Knapper , 579 So.2d 956, 959 (La. 1991). Pursuant to Brady and its progeny, a prosecutor does not breach his constitutional duty to disclose favorable evidence "unless the omission is of sufficient significance to result in the denial of the defendant's right to a fair trial." United States v. Agurs , 427 U.S. 97, 112, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976) ; State v. Willie , 410 So.2d 1019, 1030 (La. 1982). For purposes of Brady's due process rule, a reviewing court determining materiality must ascertain
not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.
Kyles v. Whitley , 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995) (citing Bagley , 473 U.S. at 678, 105 S.Ct. at 3381 ); see also State v. Strickland , 94-0025, p. 38 (La. 11/1/96), 683 So.2d 218, 234 (quoting State v. Marshall , 81-3115, pp. 13-15 (La. 9/5/95), 660 So.2d 819, 825 (quoting Kyles ) ). Thus, the reviewing court does not put the material to an outcome-determinative test in which it weighs the probabilities that the petitioner would have obtained an acquittal at trial or might do so at a second trial. Instead, a Brady violation occurs when the "evidentiary suppression 'undermines confidence in the outcome of the trial.' " Kyles , 514 U.S. at 434, 115 S.Ct. at 1566 (quoting Bagley , 473 U.S. at 678, 105 S.Ct. at 3381 ).